Kenneth Chaney
3325 West Nancy Lane
Phoenix, Arizona 85043
kennethchaney20@gmail.com
(480) 584-8543
Pro Se

FILED ___ LODGED
___ RECEIVED ___ COPY

FEB 1 1 2019

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kenneth Chaney, | ) Case No. |
| Plaintiff, | ) |
| | ) **COMPLAINT** |
| v. | ) |
| | ) **JURY DEMAND** |
| Phoenix Union High School District's Governing Board, a public | ) |
| entity; Phoenix Union High School District No. 210, a public | ) |
| entity; Chad Gestson, in his individual capacity; Laura Tells in | ) **CV-19-00888-PHX-DWL** |
| her individual capacity; and Brian Guliford, in his individual | ) |
| capacity, and Carols Morillion Varela, in his individual capacity. | ) |
| | ) |
| Defendants, | ) |
| | ) |

## COMPLAINT

Comes Now, Plaintiff Kenneth Chaney, proceeding as Pro Se and files his Complaint against the above-named Defendants on the following grounds.

## INTRODUCTION

1. This an action is for violations of race, age, and retaliation pursuant to A.R.S. § 12-541, A.R.S. § 23-785, 42 U.S.C § 2000e et seq., (Title VII) of the Civil Rights Act of 1964), as amended by the Civil Rights Act of 1991, Discrimination in Employment Act of 1967 (ADEA), 42 U.S.C. § 1983, 28 U.S.C. § 1746 and 18 U.S.C. § 1001.

## JURISDICTION AND VENUE

2. This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

3.    Venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1391(b.)

**PARTIES**

4.    Kenneth Chaney ("Plaintiff" or Chaney") is and was at all times relevant, an African-American male, army veteran, and citizen of the United States and resident of Maricopa County, State of Arizona. Plaintiff is in the protected age bracket. Since 1997, Plaintiff was and has been employed by the Phoenix Union High School District (hereinafter, "PUDHS"), first as Lead Security Assistant, Security, and Service Assistant. Plaintiff would have been employed for 20 years in May 2019 before he was terminated. Plaintiff for more than 15 years was the strength and condition coach for all sports. Plaintiff was as a voluntary assistant coach. Plaintiff was also nominated by Mr. David Cruicksahank, Coach and Teacher, for the Arizona High School Athletics Coach Hall of Fame.

5.    Plaintiff on March 14, 2014, was awarded a certificate of completion as a vendor for keeping and raising children with Developmental Disabilities by the Arizona Department of Economic Security ("DES").  Plaintiff would not have jeopardized having his certificate of completion revoked for smoking marijuana on the job. Plaintiff's job performance has always been satisfactory. There is no evidence in Plaintiff's personnel file that shows he was required to take a mandatory drug and alcohol test in the past during his employment.

6.    At all times relevant, Defendant, Phoenix Union High School District's Governing Board, (hereinafter, "GB") is a body corporate by the State of Arizona, created by statute having jurisdiction and control over public schools in the State of Arizona pursuant to Arizona Statutes 15-779.01. Defendant, "GB" has numerous duties and responsibilities that includes establishing policies and procedures such as the Drug & Alcohol Testing

2

Policy, and **(G-1961 & G- 1962 "reasonable suspicion")** source facts need before requiring an employee to take a mandatory drug test.

7.    Defendant, Phoenix Union High School District. (hereinafter, "Defendant PUHSD"), is among one of the largest school districts in the State of Arizona, and it is required to comply with policies and procedures established by its Governing Board.

8.    Defendant, Chad Gestson, (hereinafter, Defendant Gestson or "Gestson") upon information and belief, at all times relevant, held the position of Superintendent, and acting in his individual capacity exercised direct and/or indirect supervisory authority over Plaintiff or, in the alternative, was involved in one or more decisions affecting Plaintiff's employment, including, but not limited to, decisions regarding promotions, transfers, salary, job classification, and disciplinary actions. Additionally, Defendant Gestson in his individual capacity is responsible for managing budgets, supervising school principals, developing line of authority for classified employees, working with school board members, overseeing facilities, making sure that individuals in supervisory and lead capacity position are in compliance with policies and procedures established by the governing board, and District's Non-Discrimination Policy.

9.    Defendant, Laura Telles, (hereinafter, ("Defendant Telles" or "Telles") upon information and belief, at all times relevant, held the position of Executive Director, Talent, at the District Office, and acting in her individual capacity was involved in one or more decisions affecting Plaintiff's employment status including, but not limited to, decisions regarding promotions, transfers, salary, job classification, and recommending disciplinary actions, such as putting employees on unpaid and/or paid administrative leave.

10.    Defendant, Brian Guliford, (hereinafter, "Defendant Guliford" or "Guilford") upon

3

upon information and belief, at all times relevant, held the position of Principal at South Mountain High School, and in his individual capacity exercised direct and/or indirect supervisory authority over Plaintiff or, in the alternative, was involved in one or more decisions affecting Plaintiff's employment status including, but not limited to, decisions regarding promotions, transfers, salary, job classification, granting and/or denying overtime, evaluating job performance, disciplinary actions, and line of authority for classified employees.

11.   Additionally, Defendant Guliford acting in his individual capacity was responsible for assisting in developing standardized curricula, assess teaching methods, monitor student achievement and absenteeism, encourage parent involvement, assist in revising policies and procedures, administer the budget, hire, evaluate staff, and oversee facilities. Defendant Guilford was Plaintiff's immediate supervisor.

12.   Defendant, Carols Morrillon Varelas, (hereinafter, "Defendant Varela" or "Varela) upon information and belief, at all times relevant, held the position of Groundskeeper, at South Mountain High School, and acting in his individual capacity; and personal knowledge executed an affidavit under oath on January 22, 2018, that affected Plaintiff's employment status.

**STATEMENT OF CLAIMS**

13.   Plaintiff claims he is a victim of discrimination because of his race, age and retaliation because he protested employment discrimination, and was put on paid administrative leave until he was wrongfully terminated on August 3, 2018. Plaintiff claims that Defendants made false statements that resulted in him be wrongfully terminated on August 3, 2018.

4

14.    Plaintiff claims that Defendant Guliford committed perjury and made false statements in reference to the manner which he wanted Plaintiff to take a mandatory drug test, which was not in compliance with PUHSD's Drug & Alcohol Testing Policy.

15.    Plaintiff claims that Defendant Varela committed perjury and made false statements about what he did on January 18, 2018, in reference to the women's restroom and men's restroom near the north concession stand at the football stadium.

16.    Plaintiff claims that employers are legally mandated by law to conduct prompt and thorough investigations in dealing with discrimination complaints, such collecting sufficient evidence, contacting and interviewing witnesses identified by employees, but this did not occur in his case.

17.    Plaintiff claims that Defendant Telles *modus operandi* in dealing with employees, that were accused of violating regulations, as followed: **(a)** failing to do thorough investigations by not contacting and interviewing witnesses identified by employees; **(b)** tampering with evidence to support a disciplinary action; **(c)** misuse of taxpayer's money and district funding by putting employees on paid administrative for five or more months before they have an appeal hearing or terminated; and **(d)** telling employees that they should think about resigning or retiring before the school governing board makes a final decision.

18.    Plaintiff claims that Defendants, Telles and Guliford lack credibility in dealing with employees when taking disciplinary actions because they make false statements. Plaintiff claims the definition of credibility involves the notions of trust, and belief regardless of the situation. The key elements of credibility involve transparency, trustworthiness, and moral predictability.

5

19.   Plaintiff claims that he has built and maintained trust with students, athletes, families and colleagues during his employment. Trust comes from five qualities, each one as important as the next, such as kindness, reliability, competence, honesty and openness that must come to foster a sense of belief in a person's work. Plaintiff claims that he will not stand by and remain silent and let anyone damage his reputation by making false statements.

20.   Plaintiff claims that Defendant Guliford told him not to intervene in breaking up student fights because he is no longer working in security. It is common knowledge among teachers and support staff that there is always a shortage of Security Assistants on campus to intervene in breaking up student fights. Teachers and classified employees are held responsible when a student gets hurts in a fight while they are there. Plaintiff is aware of the liability that he and school district could face under 42 U.S.C. § 1983, if he fails to assist in breaking up a student fight, and a student is seriously injured. Defendant PUHSD does not provide basic training techniques for school personnel in breaking up student fights. Plaintiff based on his experience was working as security guard for the Arizona Department of Corrections, knows about the basic techniques for breaking up fights.

21.   Plaintiff on August 3, 2017 acknowledged that he received and read copies of all the materials related to Defendant's PUHSD's Drug Free Workplace Drug & Alcohol Training Program; including the District's **(G-1961 & G-1962 "reasonable suspicion")** source facts, which individuals in supervisory or lead capacity positions must have before requiring an employee to take a mandatory drug test pursuant to the District's Drug & Alcohol Testing Policy. Plaintiff claims by reading the materials this put him in a position to

dispute the reason why Defendant Guliford wanted him to take a mandatory drug test on January 22, 2018, that was not in compliance with PUHSD's Drug & Alcohol Testing Policy.

22.   Plaintiff claims that he knows about the ten (10) most commonly illegal drugs used by individuals that have a drug habit and there is a marijuana epidemic taking place on Defendant PUHSD's campuses. Chronic student absenteeism and drugs are two problems for the facing the school district.

23.   Plaintiff claims that an individual employed as a Security Assistant, at Central High School found a bag marijuana and cocaine on campus. An individual employed as a Security Assistant, at South Mountain High School reviewing the surveillance video saw a female student trying to hide marijuana in the holding room. The student took the marijuana out of her bra and stuck it down her pants.

24.   In January 2019, a teacher at South Mountain High School, became ill in her class because two students were on some type of illicit drug. The odor was so pungent that the whole class smelled it. The teacher wrote a student discipline referral and called security to have the students removed from her class. The students were not drug tested, but allowed to go their other classes.

25.   Plaintiff has witnessed students using paraphernalia to smoke marijuana and reported the incidents to the security office. Plaintiff has been involved in searching for a gun that a student brought to school. Plaintiff knows about the gun that was found in the gym under the bleachers at Betty H. Fair High School.

26.    Plaintiff has engaged in numerous conversations with teachers about students coming to class high and their clothes smelling like they have been smoking marijuana. Teachers are writing disciplinary student referrals because of the increasingly rudeness and outbursts of profane language because students are coming to class who are suspected of smoking marijuana.

27.    Teachers are being told by the nurse, principal and other school administrators that no disciplinary actions can be taken against students who are suspected of using illicit drugs, such as marijuana because there was no evidence of possession of marijuana found on a student. School nurses are not drug testing students. PUHSD does not give randomly drug testing to students before they are allowed to participate in sports.

28.    A teacher at South Mountain High School has been sending emails to school administrators about smelling marijuana coming from girl's restrooms and boy's restrooms in the "M Building."

29.    On December 6, 2018, at a Governing Board Meeting, a teacher expressed her concerns and those of other colleagues that have complained about having headaches and feeling high because students are coming to class smelling like they have been smoking marijuana.

30.    Plaintiff claims there appears to be no attempts by Defendants and/or campus administrators to address student chronic absenteeism and drug epidemic abuse district wide based on his review of the school governing board's meetings and agendas during the period 2012 to 2018. There have been no meetings held with community leaders, teachers, and parents to get input to address chronic student absenteeism and drug environment taking place on campuses district wide. It seems the district's interest in

deterring chronic student absenteeism and students smoking marijuana on campus is not important.

31.   Plaintiff learned from talking to a colleague that in February 2018, school board members (Linda Abril, Stephanie Parra, and Ian Danely) were made aware of the district wide chronic student absenteeism at a forum with educators across the district, but no attempts have been made to resolve the problem. It known among educators that chronic student absenteeism impacts school funding.

32.   Plaintiff claims his research shows that chronic absenteeism is widespread and prevalent among all student groups according to the data released by U.S. Department of Education. The research also shows there was over **6 million** student absences that occurred in 2013-14. Students missed **15** or more days of school for the same period, which is **14%** of the student population.

33.   Plaintiff claims there were over **1.6 million** missed class periods from August 7, 2017 to January 9, 2018. These numbers are district wide for the PUHSD. The number was approximately **131,000** during same time period for South Mountain High School. In addition, for the last two school years, there have been excessive turnovers of certified staff needed to teach students. The district had to hire more than 25 new certified staff for the 2017-2018 and 2018-2019 school years.

34.   Plaintiff claims that Defendants PUHSD's Administrators and its Governing Board has kept this information hidden from the general public about student using drugs on campuses, chronic student absenteeism, and the excessive turnovers of certified staff at South Mountain High School.

35. Defendants and its administrators are now at their wits in dealing with three major problems, such as chronic student absenteeism district wide, drug epidemic among students on campuses, and excessive turnovers of certified staff need to teach students.

36. Plaintiff claims that students under the influence of illicit substance abuse are not ready to learn and are at risk of long-term impairment of cognitive ability and memory. Student substance abuse is frequently associated with a lack of motivation and self-discipline as well as reduced school attendance; safety becomes an issue. Marijuana, like alcohol, is associated with increased risk of vehicle crashes and death. In addition, substance abuse is correlated with antisocial and violent behavior, such as students brining guns and knives to school, as well as other risk-taking behaviors.

37. Plaintiff claims the marijuana problems on campuses has created an unsafe and unhealthful workplace environment for teachers and classified employees, including students that do not smoke marijuana.

38. Plaintiff on January 18, 2018, while on break went to his vehicle parked on campus to get a roll of toilet paper to use an outside unlocked men's restroom near the north concession stands, near football stadium. Plaintiff pushed open the door to the men's restroom smelled marijuana and smoke was still visible. Plaintiff, therefore, choose to used an outside unlocked women's restroom instead. Plaintiff does not have any keys to lock or unlock women's or men's restroom near the football stadium.

39. Plaintiff on January 18, 2018, saw Caucasian, Candy Mills, Principal Assistant, and Hispanic, Angelica Quihuis, Senior Office Assistant, waking around the track getting their exercise. Cynthia Douglas, African-American, before she retired told Plaintiff that Defendant Guliford told her that she could no longer walk around the track to get her

exercise.

40.    Plaintiff on January 22, 2018, received a telephone call from Defendant Guliford's Assistant, Cindy Mills. She told Plaintiff that a meeting had been scheduled in the principal's conference room. Plaintiff inquired by asking Ms. Mills the purpose of the meeting, but she didn't know. Plaintiff wanted to know the purpose of the meeting; so that he would have time to select a representative of his choice if it was necessary to protect his civil and constitutional rights.

41.    Plaintiff arrived for the meeting and saw Ms. Karen Guss, Registrar & CEA Representative, but he had not selected her to be his representative. Ms. Guss attended the meeting as an independent representative for the school district, and a third party witness, to take notes of the conversations between Plaintiff and Defendant Guliford.

42.    Defendant Guliford during the meeting on January 22, 2018, told Plaintiff that on January 19, 2018, it was reported to him by Mr. Fran Bock, Campus Facility Supervisor, at South Mountain High School, that Groundskeeper, Mr. Carols Morillion Verela, reported he smelled a strong odor of marijuana coming from the men's bathroom near the football stadium on January 18, 2018.

43.    Defendant Guliford told Plaintiff that he reviewed the surveillance video that allegedly recorded Plaintiff on January 18, 2018, going and returning to his vehicle; then proceeding to use the men's restroom near the football stadium. Plaintiff told Defendant Guliford that he did not use the men's restroom because he smelled marijuana, and marijuana smoke was still visible.

44.    Plaintiff told Defendant Guliford that he used an unlocked women's restroom on January 18, 2018. Plaintiff also told Defendant Guliford that he does not have any keys to

lock or unlock the outside restrooms near the football stadium. Plaintiff did not see Defendant Varela on January 18, 2018, when he used the unlocked women's restroom near the football stadium.

45.   Defendant Guliford told Plaintiff that on January 18, 2018, he made a visit to check the outside restrooms near the football stadium. Plaintiff ask Defendant Guliford, which restrooms he checked? Plaintiff became suspicious when principal Guliford failed to give a response.

46.   Defendant Guliford told Plaintiff during the meeting on January 22, 2018, upon his review of the surveillance video and statements he received from Mr. Bock and Mr. Verela, that he had **"probable cause"** to require Plaintiff to take a mandatory drug test. Plaintiff asks Defendant Guilford **"probable cause"** for what? Defendant Guilford stated for smoking marijuana in the men's restroom. Defendant Guliford did tell Plaintiff that he had **"reasonable suspicion"** for him to take a mandatory drug test.

47.   There is no language in Defendant PUHSD's Drug & Alcohol Testing Policy that indicates "probable cause." There is a difference between "probable cause" & "reasonable suspicion." The probable cause standard is a level of reasonable belief, based on facts that can be articulated that is required in criminal law than civil law.

48.   Reasonable suspicion is a level of belief that is less than probable cause. Police officers possess reasonable suspicion if he or she has enough knowledge to lead a reasonably cautious person to believe that a criminal activity is occurring; and that the individual played some part in it.  Defendant Guliford did not have enough evidence that Plaintiff was about to commit a criminal act that would have caused him to take a drug test.

12

49.   Defendant Guilford during the meeting on January 22, 2018, told Plaintiff that he wanted to take Plaintiff to a **secluded** place on campus and observe him giving a urine sample witnessed by two Security Assistants. Plaintiff and his urine sample would be taken back to the principal's office and wait for the test results.

50.   Defendant Guliford during the meeting failed to guarantee Plaintiff that his urine sample would be secured while waiting for the drug test results. Defendant Guliford did not tell Plaintiff during the meeting on January 22, 2018, there was a certified drug testing mobile unit on campus to give him a drug test. Plaintiff was denied his **"due process"** rights by not being told there was drug testing mobile unit on campus to give him a mandatory drug test.

51.   Plaintiff was at work until his tour of duty was over on January 18, 2018 and January 19, 2018. This gave Defendant Guliford enough time to make sure that he had gathered all the relevant evidence before requiring Plaintiff to take a mandatory drug test.

52.   Defendant Guilford failed go to the "M Building" and get statements from teachers and students about Plaintiff's behavior after he returned from using the women's restroom.

53.   Plaintiff exercised his Fourth Amendment Rights to the United States Constitution, by refusing to take a mandatory drug test because it was no going to be administered in compliance with Defendant PUHSD's Drug & Alcohol Testing Policy. If an employee believes that his supervisor's order is illegal; and he refuses to obey it, the employee can't be terminated for insubordination. Defendant Guliford knew or should have known the way that he wanted Plaintiff to take a mandatory drug test was illegal and not in compliance with PUHSD's Drug & Alcohol Testing Policy.

54.   On February 13, 2018, during a meeting Defendant Telles denied Plaintiff his **"due process"** rights when she refused to let Mr. John Kuhens, Equipment Manager, ask all the questions that he was prepared to use during the meeting. Mr. Kuhens represented Plaintiff at the meeting, and he had a copy of PUHSD's Drug & Alcohol Testing Policy. Defendant Telles failed to contact and interview witnesses identified by plaintiff.

55.   On February 19, 2018, during a meeting Mr. Tom Oviatt, CEA, President, as a as settlement offered Plaintiff the following: **(1)** Plaintiff would stay on paid administrative leave until the end of the 2018 school year and **(2)** Plaintiff would stay on the same leave status until the end of 2019 school year.

56.   Mr. Oviatt told Plaintiff if he accepted the second settlement offer that he had to agree to a gag order. A gag order, also known as a protective order, is an order from a judge in a criminal trial that restricts information or comments from being made public. Gag orders provide protection to parties, witnesses and potential jurors.

57.   Defendant Telles told Plaintiff if he accepted the second settlement offer while on paid administrative leave, he would not be allowed on any high school campuses and/or attend any interscholastic athletic activities. Plaintiff declined the second settlement offer because he knew that a State cannot deprive any person life, liberty, and property without "due process" of law.

58.   Plaintiff also decline the second settlement offer because he is well known in the community and he have a good reputation. Thus, a good reputation is the general belief or opinion that other people have about another person. If a person is considered trustworthy and kind he has a good reputation. Plaintiff became suspicious because he believed the settlement offers were not approved by the Governing Board or Defendant Gestson.

14

59.   On June 18, 2018, Ms. Karen Guss executed a declaration under the penalty of of perjury that included her notes taken during the meeting between Plaintiff and Defendant Guilford on January 22, 2018. Ms. Guss' notes shows that Defendant Guliford wanted to take Plaintiff to a **discrete** place on campus for a drug test.

60.   Ms. Guss' notes supports Plaintiff's position that Defendant Guliford wanted to take Plaintiff to a **secluded** place on campus and give him a drug test. Plaintiff believes that Ms. Guss intentionally omitted from her notes the following: **(1)** Defendant Guliford told Plaintiff that he had **"probable cause"** for him to take a mandatory drug test, and **(2)** Defendant Guliford did not tell Plaintiff that he had **"reasonable suspicion"** for him to take a mandatory drug test.

61.   Defendant Guilford needed more than the surveillance video and statements provided by Defendant Verela and Mr. Bock before requiring Plaintiff take a mandatory drug test.  Defendant Guliford pursuant to the District's **(G-1961 & G-1962 reasonable suspicion)** source facts before requiring Plaintiff to take a mandatory drug test needed the following:

- **Direct observation of on-the-job consumption or use;**
- **Direct observation of employee's appearance, behavior, speech, body breath order, including such factors as slurred speech, incoherence, inability to carry on a normal conversation, red eyes, dilated pupils, unsteadiness on feet, increased carelessness, inability to perform requested tasks, or activities, and erratic behavior;**
- **Evidence of possession;**
- **A pattern of abnormal conduct or erratic behavior that is likely to be attributable to drug and/or use by the employee;**
- **Documented deterioration in the employee's job performance that is likely to be attributable to drug/or use by the employee;**
- **Frequent absenteeism or tardiness;**
- **A work-related accident;**
- **Information from a law enforcement agency, provided that the information relates to recent use as defined herein; and**
- **Information from an employee or citizen provided by a reliable source or**

**independently corroborated, provided the requested information relates to recent use as defined herein.**

62.    Defendant Guliford had none of the above **"reasonable suspicion"** source facts when he had a meeting with Plaintiff on January 22, 2018.

63.    Plaintiff on January 22, 2018, during the meeting with Defendant Guilford became suspicious about the way, the principal was trying to rush through the meeting by saying we are on a time line. Plaintiff concluded that in order for him to get fair representation, he needed some outside help Plaintiff is a member of the NAACP Maricopa County Branch

64.    Plaintiff stepped out of the conference room and called Dr. Ann Hart, Civil Rights Advocate, and told her what had taking place during the meeting. Plaintiff returned to the meeting with his cell phone on and recorded the conversation between Dr. Hart and Defendant Guilford.

65.    Dr. Hart has more than twenty-five (25) years of experience as an Administrator working with the City of Phoenix Public Schools; plus, she retired as the Deputy Director Assistant Superintendent with the Arizona Department of Education. She is also familiar with PUHSD's policies and procedures, including its Drug & Alcohol Testing Policy and the District's (G-1961 & G-1962 "reasonable suspicion" source facts that principals need before requiring employees to take a mandatory drug test. Dr. Hart while working at North High School was involved in making sure that proper procedures were followed when requiring an employee to take a mandatory drug and alcohol test.

66.    Dr. Hart informed Mr. Guliford the drug testing process that he intended to enforce must comply with PUHSD's Drug & Alcohol Testing Policy. Mr. Guliford seemed agitated when Dr. Hart asked him questions about the PUHSD's Drug & Alcohol Testing Policy. Dr. Hart asked Mr. Guilford the following questions:

16

- **Mr. Guliford was asked "if he was aware of PUHSD's Drug & Alcohol Testing Policy, which he expected Mr. Chaney to adhere to?"**

- **Mr. Guliford was asked "if he had a copy of the PUHSD's Drug & Alcohol Testing Policy to give to Mr. Chaney"? The principal responded by saying "all employees are given a copy of the policy at the beginning of the year." Dr. Hart responded by saying "very few certified or classified employees take time to read and/or may not remember policy documents."**

- **Dr. Hart asked the principal "could he quote the policy directly to Mr. Chaney?" The principal responded by saying "he had to contact Talent and request a copy of the testing policy; in an effort to refresh his own memory.**

- **Mr. Guliford stated during the telephone conversation that he had "reasonable suspicion" prompting him to instruct Mr. Chaney to take a drug test. The principal did not have a copy of the PUHSD's Drug & Alcohol Testing Policy, to give to, Mr. Chaney, to determine reasonable suspicion. The principal failed to cite any other information during the telephone conversation.**

67. Defendant Guilford prior to making a false statement to determine **probable cause"** or **"reasonable suspicion"** for requesting the drug test did not have evidence pursuant to PUHSD's Drug & Alcohol Testing Policy or (G-1961 & G-1962 "reasonable suspicion source facts.

68. Dr. Hart informed Mr. Guliford during their telephone conversation that he cannot deny Mr. Chaney's **"due process"** rights, which are guaranteed by the U.S. Constitution. Dr. Hart also told Mr. Guliford that Mr. Chaney has constitutional rights in refusing to take a drug test, because he believed that the process was not in compliance with PUHSD's Drug & Alcohol Testing Policy. Dr. Hart advised Mr. Chaney to take the drug test, **only** if it was being administered in compliance with PUHD's Drug & Alcohol Testing Policy.

69.   Plaintiff was present when Defendant Guilford was trying to get the fax to work to receive a copy of PUHSD's Drug & Alcohol Testing Policy from the District's Talent Division. Plaintiff was willing to take a mandatory drug test, only, if it was going to be administered in compliance with PUHSD's Drug & Alcohol Testing Policy.

70.   Defendant Guliford after the meeting on January 22, 2018, asks Plaintiff for his keys to room 171 in the "M Building." Plaintiff was allowed to return to his office to get his badge and jacket. Defendant Guliford and Ms. Guss escorted Plaintiff to his vehicle and let him drive home, which is a violation of District's policy. Plaintiff was put on paid administrative leave and remained there until he was terminated on August 3, 2018.

71.   Plaintiff is aware that an individual in a supervisory position outside of Plaintiff's protected class was unprofessional and caught using drugs while working. The employee was treated more favorably that plaintiff.

72.   Defendant Telles in her letter dated February 21, 2018, advised Plaintiff about the District's intention to file a NOTICE OF INTENT TO TERMINATION, seeking his dismissal for unprofessional conduct, insubordination, and violation of Governing Board Policies. Defendant Telles' reasons for dismissal can't withstand scrutiny.

73.   Plaintiff in a letter dated May 10, 2018 addressed to Defendant Gestson wanted to why he was not offered a new contact for the 2018 and 2019 school year. Plaintiff did not receive a response from Defendant Gestson.

74.   Defendant Telles in a letter dated May 18, 2018, again informed Plaintiff about a NOTICE OF INTENT to terminate his employment for violating seven district's policies, but reasons that she provided can't withstand scrutiny.

18

75.   Defendant Gestson in a letter dated May 18, 2018, informed Plaintiff about a NOTICE OF INTENT to terminate Plaintiff's employment. Defendant Gestson's reasons also, can't withstand scrutiny.

76.   Plaintiff on May 21, filed a timely appeal regarding the NOTICE OF INTENT to terminate his employment. On June 6, 2018, Plaintiff received a call from Defendant Telles about having a meeting in an effort to resolve his case. Plaintiff and Mr. John Treadwell, NAACP Representative attended the meeting. Senior Administrative Specialist Legal Assistant, Ms. Bridget Lopez, present at the meeting.

77.   Defendant Tells told Plaintiff if he resigned it would not become an official record and put in his personnel file. However, if he did not resign, the matter will put on the school governing board's agenda for a final decision. Plaintiff declined the offer to resign. The matter was put on the agenda for the school governing board's meeting held on June 7, 2018.

78.   Plaintiff's NAACP Representative, Mr. John Treadwell, and District's Attorney were invited to the conference room before the meeting started and given five minutes each to tell why the NOTICE OF INTENT to terminate Plaintiff's employment should be dismissed. The district's attorney stated that Plaintiff was not being terminated for smoking marijuana on the job but refusing to take a mandatory drug test. The district's attorney stated that employees have been terminated for refusing to take a mandatory drug test, but he failed to provide the names of any employees. The district's attorney also stated the district will be setting a precedent, if it does not terminate Plaintiff for refusing to take a mandatory drug.

79. Mr. Treadwell responded by saying, the District had allowed Defendant Guliford to set a precedent by the way he wanted Plaintiff to take a mandatory drug test that is not in compliance with the District's Drug & Alcohol Testing Policy. The school governing board voted to terminate Plaintiff's employment.

80. Plaintiff knows that two employees working on the second shift resigned rather than take a drug test. The employees worked for Facility Supervisor, Mr. Frank Bock, at South Mountain High School. Plaintiff is aware of a former employee in an administrative position, who engaged in unprofessional conduct, including using drugs during working hours. The employee is outside of Plaintiff's protected class and was treated more favorably than plaintiff.

81. On June 25, 2018, Plaintiff's appeal hearing was held before Mr. C. Benson Hufford, Attorney, to make a finding on the proposed termination. NAACP Representative, Mr. John Treadwell represented plaintiff. Dr. Hart was present as an observer attended the hearing.

82. NAACP Representative, Mr. John Treadwell, before the hearing made a written request for the district to provide four employees to be present to give testimony. The employees were the following: **(1)** Brian Fair, AP Athletics/ Activities; **(2)** Karen Guss, Registrar/CEA Representative; **(3)** John Kuhens, Equipment Manager, **(4)** Carlos Morillion Varela, Groundskeeper, and **(5)** Frank Bock, Campus Facility Supervisor. Defendant Telles gave reasons why Mr. Fair, Ms. Guss, Mr. Kuhens, and Mr. Varela could not be available to provide testimony.

83. Mr. Treadwell ask Defendant Guliford to explain why he wanted Plaintiff to take a mandatory drug test. Defendant Guliford committed perjury and made false statements

about the reason why he wanted Plaintiff to take a drug test.

84. Defendant Guliford stated that on January 22, 2018, he called for a mobile drug testing unit to be on campus to give Plaintiff a drug test. Plaintiff claims that Defendant Guilford did tell him that such a vehicle was on campus to give him a drug test.

85. Defendant Guliford in his affidavit that he executed January 22, 2018, stated that he believed Plaintiff used his employee keys to gain access to the normally locked women's restroom to use marijuana. Defendant Guilford did not check with Mr. Nickolas Reynoso, Security Lead, to see if Plaintiff had been issued keys to the outside women's and men's restroom near football stadium. Plaintiff under oath disputed the statements made by Defendant Guliford.

86. Defendant Telles testified under oath at Plaintiff's appeal hearing that she called called for a certified mobile drug testing unit to be on campus to give Plaintiff a mandatory drug test on January 22, 2018. Regardless, who made the calls, Plaintiff was not told that such a vehicle was on campus to give him a drug test. Plaintiff was denied his **"due process"** rights under the law.

87. Plaintiff's NAACP Representative, Mr. Treadwell, during Plaintiff's appeal hearing ask Mr. Bock to describe his job duties, including how often did he check to see if the women's restrooms and men's restrooms are locked near the football stadium. Mr. Bock responded by saying that his job duties are to check to see if employees on his staff have completed their work assignments.

88. Mr. Block also stated that he rarely checks to see if the outside restrooms are locked or unlocked near the football stadium because it is the reasonality of security to check on the restrooms. To shine more light on this issue it is impossible for Mr. Bock to

21

determine the outside restrooms are locked 96% of the time during normal school hours when he rarely checks on the restrooms near the football stadium.

89.    On July 17, 2018, Dr. Ann Hart, Mr. Treadwell and Plaintiff made a visit to the District's Talent Division, to review the surveillance video that record Plaintiff going to use a restroom near the football stadium on Thursday, January 18, 2018. The surveillance video shows the following: **(1)** Plaintiff cannot be seen going and returning to his vehicle; **(2)** Mr. Varela did get off the golf cart to unlock the men's restroom or check the women's locked restroom going or returning from empty trash in a dumpster near the football stadium; **(3)** Plaintiff did not use the unlocked men's restroom because he smelled marijuana; **(4)** Plaintiff had a white hat on and seen coming out of an unlocked women's restroom and returning to his assigned work area, the M Building; **(5)** Defendant Guliford getting off his golf cart checking the women's and men's restroom near the football stadium; **(6)** Defendant Guliford witnessed students arriving in cars late for their class; and **(7)** Defendant Guilford said noting to the students. Instead, he got back on the golf cart and cart and left the area.

90.    Ms. Linda Tivorsak, District Attorney, stated the surveillance video was worthless. Ms. Bridget Lopez stated the district is in the process of purchasing new surveillance cameras. The surveillance video that recorded Plaintiff on January 18, 2018, going to use a men's restroom near the football stadium shows that Defendant Varela is not a creditable witness because he committed perjury and made false statements. Paul Clark, Security Assistant, told Plaintiff that Mr. Bock had Defendant Varela under suspicion for using marijuana on the job.

22

91.    South Mountain High School's Bell Schedule for 2018-2019 shows the bell for first period is 7:55 AM – 8:50 AM. Plaintiff admitted under oath and the surveillance video confirms that he was in the vicinity of the north bathrooms at South Mountain High School near the football stadium between 10:45 and 11:45 AM on January 18, 2018; and that he used the women's restroom and not the men's restroom, because he smelled marijuana, and a strong odor of smoke was still visible. There is no conflicting testimony concerning whether the restroom doors were opened or locked because Plaintiff has no keys to the restrooms. There is no way that Plaintiff could have pushed open the door to the men's restroom and use the women's restroom if the doors were locked.

92.    Plaintiff did not see Defendant Varela and/or security staff employees monitoring at the restrooms on January 18, 2018. Plaintiff claims the surveillance cameras records the entire day and night 24/7 seven days a week. The surveillance cameras would have recorded anyone else going to use the restrooms near the football stadium.

93.    Mr. Treadwell, NAACP Representative, during the appeal hearing requested a copy of the surveillance video recording for the entire day for January 18, 2018. Defendant Telles was reluctant to provide a copy of surveillance video recording for the entire day claiming there might be confidential information on it about students.

94.    Mr. Treadwell told Plaintiff the Family Educational Rights and Privacy Act ("FERPA") is the federal law that governs educational records and surveillance in schools. It is a violation of the law to disclose a student's confidential information on a surveillance camera. The main reasons that surveillance cameras are in school is to monitor property to prevent theft, including securing safety for teachers and students. School surveillance cameras are usually placed in areas that do not infringe on students' right to privacy, such

23

as class rooms, hallways, and building perimeters. Defendant Telles' statement that confidential student information might be on surveillance cameras can't withstand scrutiny. Plaintiff believes there was information on the surveillance cameras the district did not want him to see.

95.   Plaintiff also believes because of the marijuana epidemic on campuses district wide there is a possibility, that a student or students were in the men's restroom smoking marijuana on January 18, 2018. There are no security staff employees present to monitor students' movements when they drive and park their cars on the parking lot near the football stadium where the outside restrooms are located.

96.   Defendant Telles in a letter dated on August 6, 2018, informed Plaintiff based on the evidence presented at the hearing held on June 25, 2018, the Governing Board considered the recommendation of the hearing officer and issued a final order affirming Plaintiff's Notice of Dismissal. Defendant Telles further stated due to the fact that Plaintiff was not offered an employment contract for the 2018-2019 school, the date of his dismissal will be August 3, 2018. Plaintiff's benefits will continue through August 31, 2018.

97.   Plaintiff on November 7, 2018, faxed documents to be reviewed by Ms. S. E. Goodwin, Administrative Law Judge. Plaintiff's unemployment hearing was held over the telephone at 1:00 PM. Defendant Tells testified under oath that PUHSD has contacts with several certified drug testing companies for testing employees, who are suspected of drug and alcohol abuse. Defendant Telles failed to identify the names of the companies during the hearing. Defendant Telles also testified that she called Mr. Bryan Henderson, Director of Transportation, at PUHSD, and ask him to call for a mobile drug testing unit to be on campus to give Plaintiff a drug test. This was the first time Plaintiff was made aware that

24

Mr. Henderson was involved in his case.

98.   Defendant Telles further stated that a mobile drug testing unit will remain on campus for about one hour to give an employee drug test, but Plaintiff failed to show up to be drug tested. If this was the case, why did the principal fail to tell Plaintiff there was a certified drug testing unit on campus to give him a mandatory drug test. There are conflicting statements made about who made the calls because Plaintiff was not told a mobile drug testing unit was on campus to give him a drug test on January 22, 2018. Plaintiff believes there was no mobile drug testing unit on campus to give him a drug test on January 22, 2018. Plaintiff was awarded his unemployment benefits by the Arizona Department of Economic Security ("DES") on November 3, 2018.

99.   Plaintiff on August 4, 2017, hand delivered to the district office, a written statement for Defendant Gestson titled "Terrible Working Conditions" in reference to the copy center at South Mountain High School. The conditions that Plaintiff was complaining about still exist today according to a union official.

100.   Defendant Guilford on August 4, 2017, retaliated against Plaintiff by requiring him to sign document called Line of Authority for Classified Employees that changed Plaintiff's working hours from **6:00 AM to 2:30** to **7:00 AM** to **3:30 PM**. Plaintiff had right to question Defendant Guliford as to why his working hours were being changed. Defendant Guliford was unable to provide a legitimate nondiscriminatory reason for changing the working hours. Defendant Guliford did not receive any complaints from teachers that Plaintiff was not successfully performing his job duties as a Service Assistant.

101.   The change in Plaintiff's working hours created an impact on teachers getting their materials copied in a timely manner. Defendant Guilford knew or should have known

25

that he is required to have meetings and engage in discussions with union officials before he changed Plaintiff's working hours.

102.    Defendant Guliford changed the working hours for Caucasian and Hispanic employees working in the Administration Office to 6:00 AM so they could assist helping in the copy center while Plaintiff was on paid administrative leave. The copy center's doors were not secured while Plaintiff was on leave. A math teacher found unsecured testing materials for a science mid-term test in boxes and on the floor. Students are not allowed in the copy center because of testing materials and other important information.

103.    Plaintiff learned on or about January 14, 2019 after talking to an employee that an African American male, was hired as an Assistant Basketball Coach. The new employee was given the position of Assistant Service. Plaintiff believes employee is not within the age bracket (40 or older) because the principal has been hiring younger applicants. Plaintiff was told by an employee, the Assistant Basket Coach has been allowing players in the copy center room to watch basketball films. Dr. April Coleman, AEA Representative, have sent emails to Defendant Guilford about the copy center, but she has not received a response.

104.    Defendant Guilford on October 3, 2017, continued to retaliate against Plaintiff by doing the following:

- Plaintiff was put on paid administrative leave for two days because he questioned why his working hours were changed without justification?

- Plaintiff was falsify accused of engaging in unprofessional contact while interacting with the Assistant Principal for Student Services and other staff members assigned and/or connected to the office.

- Plaintiff was no longer allowed to take his 30-minute duty free lunch in the copy center area. Plaintiff had to go to another location to take his lunch period.

- Plaintiff was directed to meet with Defendant Guliford and/or any administrators for a meeting within 24-48 hours.

105. Defendant Guilford did not tell individuals outside of plaintiff's protected class that they were no longer allowed to take their 30-minute free lunch in their assigned work area. There are no policies or procedures that requires employees to meet with principals and other administrators within 24-48 hours

106. Plaintiff had no reason in September 2017, to meet with Ms. Michelle Gutierrez, AP Discipline, and staff members assigned to the office. Plaintiff had written a student discipline referral on a student because the student engaged in miss conduct. The student had engaged in multiple repeated threats against teachers and other staff employees. Plaintiff was told by another employee the student's mother came school, and told Ms. Gutierrez that she could no longer have any interactions with her son. The student was in special education.

107. Ms. Gutierrez wanted to protect herself by requiring Plaintiff to sign a STUDENT NO CONTACT AGREEMENT, which is not part of the District's Policies. Plaintiff was considered to be unprofessional because he refused to sign the document. The district's policy is that whoever writes a student discipline referral, is entitled to receive a copy of it. Plaintiff requested a copy of the student's discipline referral for his record. Defendant Guliford was unprofessional when he retaliated against Plaintiff, by repeatedly asking him why he wanted a copy of the student's discipline referral. Mr. Richard Jones, a teacher at Betty H. Fair High School wrote a statement that he did not feel safe on campus.

108. Defendant Guliford ignores the union's contract by failing to have meetings and discussions with union officials before making any changes that affects an employee's

employment status, including jeopardizing the safety of teachers and students. Defendant Guilford in September 2017, removed Security Assistant, John Navarette, III's base position, which left all 104 surveillance cameras unmonitored, including the panic phone that is in the security office. Mr. Navarette, III, has caught and observed while monitoring the surveillance cameras the following:

- Non-students jumping the fence to get on campus.
- Students jumping the fence to leave the campus.
- Student hiding a knife in the holding room.
- Student hiding marijuana in the holding room. She took it out of her bra and stuck it down her pants.
- Followed a person on camera after they ran from security or administrator.
- Observe student hiding year books after he stole them from a room.
- Observe student having sex in the gym area.
- Observe a female student pulling a male student into the female bathroom.
- Observe a student remove cell phone from another student's back pack with her knowledge.

109.   Defendant Guilford sent out an email on September 18, 2017, about the changes that we're going to be implemented.

110.   Plaintiff's basketball team participated in the summer league in 2018 The team won a game because the other team did not have enough players and failed to show up. Plaintiff and the head coach returned to school to practice for an upcoming game. Plaintiff noticed a group of players and their coach standing by the girls' gym. Plaintiff seeing how tall the players were thought they might be junior college basketball players.

111.   Plaintiff ask Mr. Kenny Mullins, AAU Basketball Coach, why was he and some players were on campus. The coach responded by saying they were waiting for Defendant Guliford's son to come with the keys to open the girl's gym for team to practice basketball. Plaintiff witnessed the principal's son coming on campus bring the keys to

unlock the girl's gym. The keys could have unlocked all the doors on campus. Defendant Guilford was not on campus. Plaintiff also learned the principals was a member of the team.

112.    Plaintiff is familiar and understands the procedures that outside organizations are required to following before being allowed to use Defendant PUHSD's facilities. Plaintiff sent an email to Ms. Angelica Quihuis, Senior Office Assistant, to see if she had any paperwork on file for the AAU Basketball Team to use the gymnasiums on campus. Ms. Quiguis could not find any paperwork on the team.

113.    Plaintiff sent an email to Mr. Brian Fair, Athletic Director asking the same question. Plaintiff went to Mr. Fair's office to see if he had any paperwork on the team. Mr. Fair did not have any paperwork on file for the team to use the gyms. Plaintiff sent an email to Mr. John Kuhens, Equipment Manager, asking how often did the AAU Basketball Team practice. Mr. Kuhens responded by saying the team practiced 3 days a week 3-4 hours a day. The team used the gyms for practice from May 2918 to October 2018. Defendant PUHSD's **K 1681 COMMUNITY USE OF SCHOOL FACILITIES** sets the guidelines that applicants must use before using school facilities.

114.    Defendant Guliford, Principal, Brian Fair and Dr. Zachery Muñoz, District Athletic Director, knew or should have known that they had subjected the District to liability pursuant to 42 U.S.C. § 1983 if any of the basketball players were injured during practice.

115.    Plaintiff has been treated differently than similarly situated employees by Defendants in terms and conditions of his employment because of his race and age, including retaliation.

29

116.   A causal link exists between the Plaintiff's protected activity and Defendants' adverse action.

117.   Defendants willfully, intentionally, and unlawfully discriminated against Plaintiff in violation of Title VII and ADEA.

118.   Defendants' actions were done with malice or reckless indifference to Plaintiff's federally protected rights.

119.   As a result of Defendants' actions, Plaintiff has suffered loss of income, loss of fringe benefits, mental anguish, emotional distress, humiliation, inconvenience, and loss of enjoyment of life.

120.   As a result of Defendants' actions, Plaintiff will continue to suffer loss of income, loss of fringe benefits, mental anguish, emotional distress, humiliation, inconvenience, and loss of enjoyment of life.

121.   Plaintiff on September 20, 2018, filed a timely Charge of Discrimination (Charge No. 540-2018-05127) based on race, age, and retaliation with the Equal Employment Opportunity Commission ("EEOC"). The newly hired EEOC Investigator processing the Charge of Discrimination was overwhelmingly unqualified and could not even identify the prima facie elements to claims.

122.   Plaintiff on October 24, 2018, made a visit to EEOC Phoenix District Office to inquire about the status of charge. Plaintiff was told that his case had been dismissed. Plaintiff responded by saying that he did not receive any paperwork telling him the case was dismissed. Plaintiff had to fill out a form requesting a copy of the Notice of Right to Sue. Plaintiff was told that it would take 20 days before he received a copy of the Notice of Right to Sue. Plaintiff on November 13, 2018 went back to the EEOC District Office and

30

got a copy of the Notice of Right to Sue that was signed on September 26, 2018, Plaintiff's 90 days to file a lawsuit began on November 13, 2018 (a copy of which is attached hereto).

## COUNT I

### (Violation of A.S.R § 12-541, A.R.S § 13-1003, 28 U.S.C. § 1746, and 18 U.S.C. 1001 Perjury & Making False Statements)

123.    Plaintiff incorporates the foregoing paragraphs, as fully set forth herein.

124.    Defendant Guliford committed perjury by making false statement during a meeting held with Plaintiff on January 22, 2018. Defendant Guliford contends that he did not tell Plaintiff that he had **"probable cause"** but **"reasonable suspicion"** for Plaintiff to take a mandatory drug test. Defendant Guliford contends that he did not tell Plaintiff that he wanted to take Plaintiff to **secluded** place on campus and observe him giving a urine sample and witnessed by two assistants; then Plaintiff and his urine sample would be taken back to the principal's office and wait for the test results.

125.    Defendant Guliford did not have a copy of PUHSD's Drug & Alcohol Testing Policy or **(G-1961 & G-1962 "reasonable suspicion")** source facts to determine that Plaintiff needed to take a mandatory drug test. Defendant Guliford contends that he called for a mobile drug testing unit to be on campus on January 22, to give Plaintiff a drug test. Defendant Guliford did not tell Plaintiff that such a vehicle was on campus to give him a drug test. Karren Guss, CEA Representative's, notes shows that Defendant Guilford wanted to take Plaintiff to a **discrete** location on campus and give him a drug test.

126.    Defendant Telles contends that she called for a mobile drug testing unit to on campus to Plaintiff a mandatory drug test, but there is conflict in her statement because she stated that she called Bryan Henderson, Director of Transportation, at PUHSD for him

31

to make a call for a mobile drug testing unit to be on campus to give Plaintiff a drug test on January 22, 2018. Defendant Telles or Bryan Henderson did not call Plaintiff tell him there was a mobile drug testing unit on campus to give him a drug test on January 22, 2018.

127.   Defendant Varela committed perjury and made false statements that played role in Plaintiff being terminated on August 3, 2018. The surveillance camera that recorded Plaintiff on January 18, 2018 going to use an outside restroom near the football stadium shows that Defendant Varela did not stop going or returning from empty trash in a dumpster near the football stadium. Defendant Varela did not check an unlocked women's and men's restroom near the football stadium. Plaintiff has no employee keys to lock or unlock restrooms at the football stadium. Plaintiff was seen coming out of an unlocked restroom on January 18, 2018.

128.   An employer has every right to investigate thoroughly to see if an employee has made false accusations against another employee, but this was not done in Plaintiff's case. Defendants in authority working at district office, including school board members failed to gather all relevant facts information before Plaintiff was terminated on August 3, 2018. Instead, they accepted as gospel the false statements made by Defendants Guliford and Varela. Employers and employees have an affirmative duty to tell the truth and not make false statements.

<b><u>COUNT II</u></b>

<b>(Title VII Race & Retaliation & Age Discrimination)</b>

129.   Plaintiff incorporates the forgoing paragraphs, as fully set forth herein.

130.   Defendants have engaged in intentional race and retaliation in terms and conditions of employment by allowing an employee to make false accusations. The

32

Plaintiff's working hours were changed without a legitimate nondiscriminatory reason, caused an impact on teachers getting that their material copied in a timely manner.

131.    Plaintiff after complaining about the change in his working hours was put on paid administrative for two days. Plaintiff was retaliated against by not being allowed to take his 30-minute free lunch period in his assigned work area. Individuals outside of Plaintiff's class and his age group were treated more favorably than Plaintiff. The individuals were allowed to take their free 30-minute free lunch period in their work area. Individuals outside of plaintiff's protected class were treated more favorably because those individuals' working hours were changed to 6:00 AM, so they could work in the copy center.

## COUNT III

### (42 U.S.C. § 1983)

132.    Plaintiff incorporates the forgoing paragraphs, as fully set herein.

133.    42 U.S.C. § 1983 reads pertinent part:

> **Every person under the color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, ant citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in the action at law, suit in equity, or other proper proceedings or redress.**

134.    Upon information and belief, Defendant Guilford knew or should have known based on PUHSD's Drug & Alcohol Testing Policy and (G-1961 & G-1962 **"reasonable suspicion"** source facts, that he could not have made Plaintiff take a mandatory drug test by the way he attended to enforce it. Defendant Guliford knew or should have known that he was required to comply with the PUHSD's Drug & Alcohol Testing Policy, including (G-1961 & G-1962 **"reasonable suspicion"** source facts before requiring Plaintiff to take

33

drug test.

135.    Plaintiff has Constitutional rights in refusing to take a drug test because he believed that the process was not in compliance with PUHSD's Drug & Alcohol Testing Policy. Plaintiff was denied his **"due process"** rights when he was not told there was a mobile drug testing unit on campus to give him a drug test on January 18, 2018. Plaintiff is aware that an individual, who engaged in unprofessional conduct and as caught using a drug was treated more favorably than plaintiff. The individual was outside of Plaintiff's protected class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Kenneth Chaney prays for judgment against the defendants and each of them asks the Court to award him the following:

(A)   A declaratory judgment that the acts, practices of Defendants were in violation of Title VII of the Civil Rights Act of 1964, as amended, ADEA, and 42 U.S.C. § 1983.

(B)   Actual damages to fully and fairly compensate in in an amount proven at trial;

(C)   Consequential and compensatory damages as a foreseeable result of defendants' wrongful discharge of plaintiff;

(D)   The Court to grant full back pay to Plaintiff;

(E)   The Court grant Plaintiff compensatory damages mental anguish, emotional distress, and humiliation;

(F)   An award of damages against Defendants, jointly and severally, for the violations alleged herein including, but not limited to compensation for lost and future wages and benefits, and pre and post-judgment interest;

(G)   Attorneys' fees and costs as provided by law;

(H)   All such relief as the Court deems just and fair.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) Fed. R. Civ. P., Plaintiff Kenneth Chaney hereby demands a jury trial of each issue alleged in the complaint.

RESPECTFULLY SUBMITTED this 11th day of February 2019.

By _Kenneth Chaney_
Kenneth Chaney

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 540-2018-05127 |

**Arizona Attorney General's Office, Civil Rights Division** _____ and EEOC

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)*<br><br>**Kenneth Chaney** | Home Phone *(Incl. Area Code)*<br><br>**(480) 584-8543** | Date of Birth<br><br> |
|---|---|---|

Street Address **3325 W. Nancy Lane, Phoenix, AZ 85041**        City, State and ZIP Code

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name<br><br>**PHOENIX UNION H S DISTRICT** | No. Employees, Members<br><br>**500 or More** | Phone No. *(Include Area Code)*<br><br>**(602) 271-3118** |
|---|---|---|

Street Address **4502 N. Central Ave.,  Phoenix, AZ 85012**        City, State and ZIP Code

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|

Street Address        City, State and ZIP Code

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN

☒ RETALIATION  ☒ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION

☐ OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest        Latest
**08-03-2018**

☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

On or about August 8, 1999, I was hired by the above-mentioned employer. My last position was a Service Assistant.

On or about January 22, 2018, I met with Respondent and they advised I would be required to take a drug test. I refused to take the drug test because it was not being administered in compliance with the Respondent's policies.

On or about August 3, 2018, my employment was terminated.

I believe I have been discriminated against because of my race (black) in violation of Title VII

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| Sep 20, 2018        *Date*        *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| | ☐ FEPA<br>☒ EEOC | 540-2018-05127 |

| Arizona Attorney General's Office, Civil Rights Division | and EEOC |
|---|---|
| *State or local Agency, if any* | |

of the Civil Rights Act of 1964, as amended, and age (51), in violation of the Age Discrimination and Employment Act of 1967, as amended. I believe I was retaliated against for engaging in protected activity under Title VII and ADEA.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| Sep 20, 2018 _____<br>Date   Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To:  Kenneth Chaney
     3325 W. Nancy Lane
     Phoenix, AZ 85041

From:  Phoenix District Office
     3300 North Central Ave
     Suite 690
     Phoenix, AZ 85012

[ ]  *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 540-2018-05127 | **Anick Flores,**<br>**Supervisor** | **(602) 640-5031** |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X]  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]  Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Enclosures(s)

Elizabeth Cadle,
District Director

SEP 2 6 2018

*(Date Mailed)*

cc:  Laura Telles
     Executive Director, Talent
     PHOENIX UNION HIGH SCHOOL DISTRICT
     4502 N. Central Ave.
     Phoenix, AZ 85012

Enclosure with EEOC
Form 161 (11/16)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS   --   **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date.** Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

PRIVATE SUIT RIGHTS   --   **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

ATTORNEY REPRESENTATION   --   **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do **not** relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, please make your review request **within 6 months** of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*